**Lawrence A. HERBERHOLT,**
**Plaintiff-Appellant,**

v.

**dePAUL COMMUNITY HEALTH CENTER, a corporation,**
**Defendant-Respondent.**

No. 62628.

Supreme Court of Missouri,
En Banc.

Sept. 8, 1981.

As Modified on Denial of Appellant's Rehearing Dec. 14, 1981.

Respondent's Rehearing Denied
Jan. 12, 1982.

---

David M. Duree, St. Louis, for plaintiff-appellant.

Rexford Caruthers and Richard Watters, St. Louis, for defendant-respondent.

John Ashcroft, Atty. Gen., Jan Bond, Asst. Atty. Gen., Jefferson City, for intervenor.

Michael D. Gordon and Marsha J. Murphy, Kansas City, Clyde E. Craig, St. Louis, James W. Gallaher, Jefferson City, Lawrence A. Rouse, Paul E. Donnelly and Charles W. German, Kansas City, for amicus curiae.

Michael W. Manners, Bruce G. Heavner, Stephen B. Millin, Jr., Kansas City, for Missouri Association of Trial Attorneys amicus curiae.

PER CURIAM.

Pursuant to Rule 83.02, the Eastern District of the Court of Appeals transferred the within cause to this Court that it might consider, again, the constitutionality of the so-called "service letter statute" (§ 290.140, RSMo 1978).[1]

The appeal by plaintiff, now appellant, is from the trial court's entry of a judgment notwithstanding the verdict or in the alternative a new trial in an action for noncompliance with § 290.140 (Count I) and directed verdicts in actions for libel (Count II) and slander (Count III).

Appellant is a graduate electrical engineer with several years experience. On January 29, 1976, he was employed by de-Paul Community Health Center as director of maintenance for a five building medical complex then being constructed by the latter. As of the date of hiring, two of the buildings were substantially complete and were considered "on-line" facilities. They were (1) St. Anne's Nursing Home and (2) the power plant. The interviewing and actual hiring of appellant was by one Felix McKeown, the owner's technical representative who had the primary responsibility for monitoring construction and ensuring full performance of all construction contracts.

At the commencement of his employment, appellant was charged with the task of pursuing corrections to any and all nonconforming systems and equipment at St. Anne's and the energy center. All discovered defects were recorded on a "punch list" and appellant either made the correction himself with his crew, or referred the job to the original vendor or installer if the defective condition was covered by a warranty. The same action was taken with regard to defects arising during the operation of the buildings subsequent to their acceptance. Appellant testified that he discovered numerous design or construction defects that McKeown should have discovered.

Sometime during the summer of 1976 respondent contacted Southwestern Bell Telephone Company (Bell) to investigate the possibility of prewiring the hospital building then under construction. Bell stated that while it typically did not prewire commercial accounts, it would in this instance if respondent provided complete and accurate drawings showing where the telephones were to be located and the position of walls wherein the wiring conduits would be placed. Respondent assured Bell that such plans would be provided. At this time, respondent already had retained Comtrol, Inc., a communications consultant, to recommend a phone system for the hospital. In the preparation of the plans to be given Bell, discrepancies between Comtrol's plans and the design and development plans (DD drawings) were discovered. McKeown instructed appellant to transpose Comtrol's drawings onto the DD drawings and appellant did so. The new drawings were then given to Bell representatives.

It developed that because of significant design changes, the new drawings were inaccurate. Bell notified McKeown of this problem and repeated its request for accu-

---

1. Subsequent to said transfer, this Court ruled that § 290.140 was constitutional in *Hanch v. K.F.C. Nat'l Management Corp.*, 615 S.W.2d 28 (Mo. banc 1981). *Accord: Rimmer v. Colt Indus. Operating Corp.*, 656 F.2d 323 (8th Cir. 1981). Nevertheless, to save judicial time, we do retain jurisdiction and seek to resolve the issues as on original appeal. Mo.Const. art. V, § 10.

rate plans. As the installation of the phone system fell into McKeown's realm of responsibility, he scheduled meetings with various medical department heads to finalize their system requirements and update the plans. Numerous other meetings and contacts were also made between McKeown and Bell. The record makes clear that the phone problem was significant and difficult. In August revised plans were again submitted to Bell; but, as before, they were incomplete and inaccurate.

On September 13, a Bell representative, Ken Leeker, met with appellant and McKeown's secretary. Leeker brought a list of deficiencies in the plans that would have to be corrected before Bell could complete the installation. McKeown arrived later and became upset about all the defects and then left. Early on the morning of September 14, Bob Schiller of Fruin-Colnon, the managing contractor, called appellant and asked about progress on the phone problem. Appellant apparently told him of the events of the September 13 meeting. Appellant testified that shortly thereafter, McKeown berated him for giving incorrect information regarding the phone problem to Walter Zimmerman, Schiller's superior, and terminated appellant's employment. McKeown then offered appellant one month to find other employment and said that he would provide appellant with a recommendation. Appellant performed his job until October 1 when McKeown told him to get off the job site immediately. Appellant received a check paying him through October 13, 1976, and a check for accrued vacation time.

Appellant filed his written request for a service letter on October 4, and the text of the letter received is as follows:

On Tuesday, September 14, I advised you of your termination and gave you one month's notice and you were informed that time could be taken to seek employment elsewhere. However, due to your abuse of this privilege, I elected to cease your services on October 1, 1976, but you were paid through October 13, as well as receiving payment for accrued vacation benefits.

Your employment was terminated by the undersigned because of the following reasons:

1. Your inability to supervise and advantageously utilize the time of your employees.

2. Your statement to me that you were weak in the area of Electrical Engineering in spite of the fact that you have an Electrical Engineering degree.

3. For quite a period of time you complained about the performance of some people who worked for you and did nothing about it until I told you not to use them as an excuse and to terminate them and then you only terminated one of them.

4. Your explosive reaction during the Professional Office Building "key" incident when you were requested to pick up a key to the Professional Office Building and hang it in a conspicious place in the Energy Center to be used only in an emergency. Your response was a verbal tirade suggesting that this was only the "tip of the iceberg" that some mysterious force was conspiring to saddle you with the total maintenance of the Professional Office Building after I repeatedly told you this would not happen.

5. Your constant complaining about the mechanical, electrical and architectural systems in St. Anne's and the Energy Center despite the fact that on numerous occasions I informed you that deviations from the original specs were required because of budgetary limitations.

6. You did not, of course, direct or guide the Energy Center employees because they had many years of hospital boiler-room experience compared to your 7 or 8 months and they conversely could and did train and educate you in the operation of the plant.

7. You did demonstrate your ability to threaten people, cases in point being the Garratt-Callahan Chemical employees who you threatened to throw bodily out of your office and became extremely vocal with them. Your words to me on

your departure were that I wouldn't find a rock big enough to hide under to escape physical abuse rendered by you. All of this was said in the presence of witnesses.

8. Normal activities that you were requested to perform became "crises" items and you found innumerable reasons to blow them all out of proportion, and I could never understand your sense of priorities.

9. You complained about the engineers in the Energy Center being disrupted in their work by outside requests and used as an example that while performing some menial task they received a phone call to push a button to start the fire pump which takes all of five seconds.

10. Your personality and negative attitude were not compatible with the personnel in this Office.

This letter was signed by Felix McKeown in his capacity as Owner's Technical Representative.

Thereafter, appellant filed suit sounding in three counts. Count I alleged a violation of the service letter statute in that respondent, acting by and through its employee and agent Felix McKeown, failed to provide a letter stating the "true reason" for his discharge. Count II alleged that the contents of the letter were libelous and defamatory. Count III alleged that McKeown, appellant's supervisor, made defamatory and slanderous statements about him.

The trial court sustained respondent's Motion[s] for Directed Verdict on Counts II and III at the close of appellant's evidence. Count I was submitted to the jury which returned a verdict for appellant of $15,000 actual damages and $100,000 punitive damages. Upon motion, the court entered a judgment notwithstanding the verdict in respondent's favor. (A conditional order was entered also providing that if the entry of judgment n. o. v. was reversed on appeal, respondent's Motion for New Trial would be sustained on the question of damages only unless appellant remitted $11,825 actual damages and $50,000 punitive damages.)

## COUNT I

Appellant's theory of the case was that he was fired because of the "telephone incident" and discovering and divulging several construction and design defects that McKeown should have discovered and not for the reasons given.

■ We do dispose, preliminarily, of one issue first raised on appeal, *i.e.*, that the service letter statute does not and was never intended to apply to not-for-profit corporations such as respondent. The argument is predicated upon two ideas: first, not-for-profit corporations do not "do business" within this state in the manner contemplated by the statute; and second, at the time the statute was enacted in 1905, charitable corporations were immune from private suits sounding in tort.

The assertion is faulty for several reasons. It is recognized that charity work is big business and that charitable corporations should "stand equal before the law . . . ." *Abernathy v. Sisters of St. Mary's*, 446 S.W.2d 599, 603 (Mo. banc 1969). Further, the statute clearly applies to *all* corporations doing business in this state; any exception for charitable corporations is conspicuously absent. The attempt to equate a charitable corporation to a municipal corporation is equally faulty for it fails to recognize that the latter are essentially political entities while the respondent is virtually identical to profit motivated corporations.

At the close of all the evidence, respondent moved for a directed verdict alleging *inter alia*, that the evidence showed that no prospective employer requested a service letter and that appellant volunteered it, thus, creating his own damages; that appellant produced no evidence of actual damages in that the evidence failed to show that appellant was either refused employment because of the letter or was hindered in procuring such employment because of any deficiency in the service letter, or the salary of any job appellant did not receive because of the service letter. The case, nevertheless, was then given to the jury which returned the verdict for appellant.

Respondent then moved for a judgment n. o. v. or in the alternative for a new trial. Said motion included the same reasons contained in the motion for directed verdict. The trial court then entered its judgment n. o. v. against appellant based upon the reasons heretofore noted.

In reviewing the entry of the judgment notwithstanding the verdict, this Court must, in the exercise of its fair and impartial judgment, decide whether, considering all the evidence and the reasonable inferences to be drawn therefrom, there is no room for reasonable minds to differ on the issues. *Gregory v. Robinson*, 338 S.W.2d 88 (Mo.1960); *Cathey v. DeWeese*, 289 S.W.2d 51 (Mo.1956).

■ Appellant attacks the j. n. o. v. on three grounds. First, he contends that he is not required to prove that he suffered any actual damages. In support of this contention, he refers to MAI 23.08, the service letter verdict directing instruction, which reads as follows:

Your verdict must be for the plaintiff if you believe:

First, the plaintiff was employed by the defendant for at least 90 days, and

Second, after his employment was terminated the plaintiff made a written request to the superintendent [manager] of the defendant for a letter of dismissal, and

[Third, the defendant did not issue such a letter to plaintiff]

[Third, the defendant did not issue such a letter to plaintiff within a reasonable length of time after such request]

[Third, the defendant's letter did not correctly state the

(a) length of employment

(b) the true cause of plaintiff's termination

(c) the nature and character of services rendered]

Appellant correctly points out that neither the instruction, nor the Committee Comments require a plaintiff to prove actual damages. The courts of this state have also found appellant's position to be correct, but only so long as a plaintiff receives nothing more than an award for nominal damages. As stated in *Heuer v. John R. Thompson Co.*, 251 S.W.2d 980, 985 (Mo.App.1952):

It is true that plaintiff proved no actual damage, but having proved an invasion of her legal right, it was not necessary that she prove actual damages in order to be entitled to a verdict for $1 nominal damages. (citations omitted) The failure to give a proper service letter constituted an invasion of plaintiff's legal rights and without proof of any damages whatever entitled plaintiff to a verdict for nominal damages. The law presumes actual damage to plaintiff from the failure of defendant to issue a proper service letter as required by the statute (citations omitted). Appellant contends that before the verdict for actual damages may be sustained there must be some evidence that plaintiff sought and was refused employment by reason of an improper service letter. Appellant is correct in cases where an effort is made to sustain a verdict for substantial actual damages, (citations omitted), but the rule does not apply where the verdict is for nominal damages only.

*Id.* at 895.

It is clear that to sustain a substantial award of actual damages, the plaintiff must produce evidence of such damages. In the present case, appellant received an actual damages award of $15,000 and therefore must be able to prove entitlement to that sum.

■ Appellant's second attack on the j. n. o. v. is that he did prove actual damages. The elements of actual damages a plaintiff must prove in a service letter case are set forth in *Rotermund v. Basic Materials Company*, 558 S.W.2d 688, 691–92 (Mo.App.1977) and are: (1) that on or about an approximate date the plaintiff was either refused employment or hindered in obtaining such employment; (2) that the refusal or hinderance was caused by the absence or inadequacy of the service letter; (3) that the position the plaintiff had difficulty obtain-

ing was actually open; (4) the salary rate of that position.[2]

■ Clearly, the record is utterly devoid of any direct evidence that any prospective employer held the service letter against appellant in any respect. In fact, appellant's testimony confirms as much. For instance, when asked " . . . did you have any knowledge or have you received any information that that service letter hampered or impaired your ability to secure a job from any prospective employer that you contacted?" he replied: "No, I did not."

Appellant cites *Cook v. Mid-Continent Petroleum Corporation*, 193 S.W.2d 66, 68–69 (Mo.App.1946), to say that a plaintiff may prove that he was denied employment for a lack of a service letter by circumstantial evidence. Presumably, the same rule would apply to service letters which do not state the true reason for a discharge. However, it is also clear that "the circumstances must be such as will sustain the inference to be drawn, and must rise above the level of mere guess and speculation." *Booth v. Quality Dairy Company*, 393 S.W.2d 845, 848 (Mo.App.1965).

The transcript discloses that appellant made application to several prospective employers, one of which was St. Mary's Hospital of East St. Louis. Appellant received two interviews with the latter, but the job was awarded to another applicant. Evidence was presented showing that some of appellant's former employers gave favorable accounts of his performance. Appellant showed the service letter to the St. Mary's personnel manager at the second interview. Appellant argues that this evidence was sufficient to allow the jury to infer that he did not receive the St. Mary's job because of the contents of the letter.

■ However, the evidence also supports more convincingly a different inference. The record of appellant's interviews shows that he would have been willing to take a 10 to 15 percent cut in pay to work

at St. Mary's, or $17,000 to $18,000. The applicant St. Mary's finally hired received a salary of approximately $15,000, and this evidence strongly supports the inference that appellant was not hired because the successful applicant would accept less money. As stated in *Osterhaus v. Gladstone Hotel Corporation*, 344 S.W.2d 91, 94 (Mo. 1961):

We think it well stated by Stone, J., in *Hogue v. Wurdack*, Mo.App., 298 S.W.2d 492, 498 [12–14]: 'Of course, a finding essential to recovery may be proved by circumstantial evidence; but, our appellate courts have said repeatedly that, in civil cases, the shown circumstances must be such that the facts necessary to support the finding may be inferred and reasonably must follow, that the existence of such facts may not depend upon guesswork, conjecture and speculation, and that the evidence should have a tendency to exclude every reasonable conclusion other than the one desired. Although an inference need not be justified beyond all doubt and is not precluded by a mere possibility that the contrary may be true * * *, the law does not countenance the drawing of forced and violent inferences which do not arise from a reasonable interpretation of the facts actually shown; and, where the evidence affords no more than equal support for either of two inconsistent and contradictory inferences as to the ultimate and determinative fact, liability is left in the field of conjecture and there is a failure of proof.'

Inasmuch as the evidence adduced by appellant to support his theory of "actual" damages is susceptible of multiple interpretations, it appears that he has failed to prove that *any* prospective employer did not hire him because of the contents of the service letter. Thus, under the existing law, appellant failed to make a submissible case for actual damages. However, as heretofore noted, failure of proof thereon does not

2. See also: *Porterfield v. Burger King Corp.*, 540 F.2d 398 (8th Cir. 1976), plaintiff must introduce some evidence of refused employ-ment because of lack of, or deficiencies in, the service letter.

deprive him of a judgment for nominal damages if he was not provided with a letter stating the *true* reason for his discharge. *Howe v. St. Louis Union Trust Company*, 392 S.W.2d 625 (Mo.1965). Appellant offered sufficient evidence to sustain a finding that the true and actual reason for his discharge was the "telephone incident" wherein McKeown had "berated" him for divulging construction and design defects under circumstances reflecting upon McKeown's failure to do so, and not for those reasons given in the letter. Nominal damages, properly found, serve as an adequate basis for an award of punitive damages where either actual or legal malice is present. *State ex rel. St. Joseph Belt Ry. Co. v. Shain*, 341 Mo. 733, 108 S.W.2d 351 (1937). "Legal malice exists where a wrongful act is intentionally done without just cause or excuse; whereas, actual malice or express malice exists when one with a sedate, deliberate mind and formed design injures another." *Schmidt v. Central Hardware Company*, 516 S.W.2d 556 (Mo.App. 1974). The letter, as quoted herein, evidences conduct reflecting at least "legal" malice and further comment thereon is not necessary.

Based on the foregoing, we have concluded that the trial court did not abuse its discretion in entering its "conditional order" reference Count I, but for the reasons heretofore noted the same should be modified to provide for actual damages in the nominal amount of $1.00 and punitive damages of $50,000.

## COUNT II

Appellant next argues that the trial court erred in sustaining respondent's motion for a directed verdict on Count II, which alleged that the contents of the service letter were libelous. The motion was entered at the end of appellant's evidence and alleged the following: (1) that the petition failed to state a claim; (2) that the contents of the letter were not libelous per se and that appellant proved no damages; (3) that respondent did not publish the letter; (4) that appellant requested the letter, and its contents therefore were absolutely privileged; and (5) that appellant requested the letter, and its contents thus were covered by a conditional privilege not destroyed because appellant failed to prove malice on respondent's part. Because the trial court merely entered its ruling on the motion, there is no way to determine which of these allegations formed the reason for sustaining the motion.

■ A trial court may direct a verdict for the defendant at the close of the plaintiff's evidence, but this should be done only when all the evidence and the reasonable inferences to be drawn therefrom are so strongly against the plaintiff "that there is no room for reasonable minds to differ." *McCarthy v. Wulff*, 452 S.W.2d 164, 168 (Mo.1970); *Baumle v. Smith*, 420 S.W.2d 341, 344 (Mo. 1967). The authority for the trial court to act in the premises, however, was recognized in *Spradlin's Market, Inc. v. Springfield Newspapers, Inc.*, 398 S.W.2d 859, 865 (Mo.1966), wherein it was held that Section 8 of Article I of the Missouri Constitution, guaranteeing the right to a jury in libel cases, "did not deprive a judge of the authority to direct a verdict."

Conduct comprising the tort of libel has been broken into three elements, *i.e.*, composition of a statement, its writing and its publication. *Dobbin v. Chicago, R.I. & P. Ry. Co.*, 157 Mo.App. 689, 138 S.W. 682 (1911). Respondent has argued throughout that there has been no "publication" because the information complained of was not communicated, by it, to any third person. The Eastern District agreed and quoted with approval from *Ramacciotti v. Zinn*, 550 S.W.2d 217, 223 (Mo.App.1977), that: "[c]ommunication of libelous matter only to the plaintiff who then discloses it to third parties does not subject defendant to liability." Similar declarations may be found in 50 Am.Jur.2d, *Libel and Slander*, § 149; although in § 148 thereof, it is recognized that: "Many cases make an exception to or qualification of the general rule that there must be a communication to others than the person defamed, where the utterer of the defamatory matter intends, or has reason to suppose, that in the ordinary course of

events the matter will come to the knowledge of some third person." As evidenced by *Harbison v. Chicago, R.I. & P. Ry. Co.*, 327 Mo. 440, 37 S.W.2d 609 (1931), the presence or absence of a "legal" publication is not fixed by any precise formula.

Nevertheless, for other reasons, we do not believe the instant case should turn on the publication issue.

■ First, "§ 290.140 makes it the duty of a corporation upon the written request of a former employee to, so far as material here, 'issue to such employee a letter ... truly stating for what cause, if any, such employee has quit such service.' Thus, a legal duty was imposed upon defendant to issue the communication here involved on plaintiff's written request. Under the above authorities said service letter was a *qualified privileged communication*." (Emphasis added). *Williams v. Kansas City Transit, Inc.*, 339 S.W.2d 792, 796 (Mo.1960). "The result is that when the principle of conditional privilege is established, *plaintiff* must then assume a greater burden in order to make a submissible case. We find this principle forcefully announced by the Missouri Supreme Court in *Pulliam v. Bond*, 406 S.W.2d 635, 641 (Mo.1966). There, in an action for libel, the court quoted with approval from 53 C.J.S., Libel and Slander § 101, as follows: 'The utterance or publication of a communication on a privileged occasion rebuts the inference of malice and falsity which would otherwise arise as a matter of law; and, where such a communication is shown, *the burden of proving its falsity* and that *the defendant was actuated by express malice is generally held to be on the plaintiff.*' (Italics in original.) It was then added: 'The rule is recognized in Missouri as well as elsewhere that the existence of a conditional or qualified privilege precludes an inference of malice from the communication of false and defamatory matter, and the plaintiff has the burden of proving express malice.' See *Porterfield v. Burger King Corp.*, 540 F.2d 398 (8th Cir. 1976)." *Cash v. Empire Gas Corp.*, 547 S.W.2d 830, 834 (Mo.App.1976).

■ Second, the alleged defamatory matter was not shown to be libelous per se and there was no showing of actual "special damages." Absent the latter, the communication made is not a basis for a claim of libel per quod. *Brown v. Kitterman*, 443 S.W.2d 146, 151 (Mo.1969).

Third, appellant by his own testimony *totally* eliminated any issue as to damages by establishing that none were suffered. He testified that no prospective employer had asked for a service letter; that he did not "have any knowledge or ... information that that service letter hampered or impaired [his] ability to secure a job from any prospective employer; and, that he knew of no one in the engineering community who held him up to contempt or ridicule as a result of the statements in the service letter."

The trial court properly entered the directed verdict against appellant on the libel count.

## COUNT III

■ Appellant next complains that the trial court erred in sustaining respondent's motion for a directed verdict on Count III, which alleged a new "fact" that respondent's employee and agent, Felix McKeown, made a slanderous remark about appellant. The allegation was that: "... McKeown, in his capacity as agent and servant of the defendant made the following statement[s] to Jacqueline Jones, to-wit: 'Did you know that Larry Herberholt drank on the job?'" (Ms. Jones, as alleged, was a Personnel Director for defendant in a department which did not have any personnel department duties in relation to the employment of plaintiff.)

Respondent's motion presented the following: (1) that the petition [count] failed to state a claim, (2) that there was no showing that the statement was slanderous per se or that he was damaged, (3) that appellant failed to show that McKeown was acting within the scope of his employment when he made the statement, and (4) that appellant's own evidence established that the statement was covered by a qualified

privilege not destroyed by any malice on respondent's part. Again, because the trial court merely entered its ruling on the motion, there is no way to determine the exact basis for the ruling. Relevant law found in the discussion of Count II, and again applicable, need not be repeated.

The threshold question and one thought dispositive of the allegations, is whether or not McKeown's statement, wrongful or not, can be imputed to respondent; that is, whether McKeown was acting within the scope of his employment when the alleged act was committed.

To establish this point, appellant refers to the pleadings wherein respondent admitted that McKeown was its agent, but also affirmatively pleaded that the alleged act of slander was beyond the scope of his authority. Appellant reads these positions as being wholly inconsistent and that once respondent admits the agency, he argues that respondent cannot thereafter deny the agency. On this point, appellant is probably correct. However, respondent's answer is not a denial of the existence of an agency, but is the statement of the affirmative defense that McKeown's alleged act was beyond the scope of that relationship. It is extremely unlikely that it is within the scope of any agent's authority to commit *intentional* tortious acts.

It is beyond question that if an agent's act is done in the course of the agency, and by virtue of the authority as an agent, the principal is responsible. *Tietjens v. General Motors Corp.*, 418 S.W.2d 75 (Mo.1967). The converse is equally true:

> The mere existence of the relationship of master and servant, however, is not sufficient in and of itself to impose liability on the employer in all circumstances for whatever torts his employee may commit since all acts of an employee are not as an employee or necessarily in the course and scope of his employment. (citation omitted)

*Brannaker v. Transamerican Freight Lines, Inc.*, 428 S.W.2d 524, 534 (Mo.1968).

The challenged statement was made to an employee apparently having no connection with McKeown or appellant, and there appears to have been no business purpose of respondent served by the communication. McKeown was the Owner's Technical Representative and his responsibility was to ensure the performance of construction contracts. The statement was not related to the performance of those tasks and necessarily was beyond the course and scope of McKeown's employment. Even if accepted as slanderous, the statement legally cannot be attributed to respondent and the ruling on Count III was correct.

The judgment of the trial court is affirmed as modified and the cause is remanded for entry of judgment accordingly.

SEILER, MORGAN, HIGGINS and BARDGETT, JJ., concur.

DONNELLY, C. J., dissents in separate dissenting opinion filed.

RENDLEN and WELLIVER, JJ., dissent and concur in separate dissenting opinion of DONNELLY, C. J.

DONNELLY, Chief Justice, dissenting.

I respectfully dissent.

As to the award of punitive damages, I dissent for the same reasons expressed in my dissent in *Hanch v. K.F.C. National Management Corp.*, 615 S.W.2d 28, 37 (Mo. banc 1981).

I am compelled to make additional observations about the Service Letter Statute, § 290.140, RSMo 1978, which provides:

> "Whenever any employee of any corporation doing business in this state shall be discharged or voluntarily quit the service of such corporation, it shall be the duty of the superintendent or manager of said corporation, upon the written request of such employee to him, if such employee shall have been in the service of said corporation for a period of at least ninety days, to issue to such employee a letter, duly signed by such superintendent or manager, setting forth the nature and character of service rendered by such employee to such corporation and the duration thereof, and truly stating for what cause, if any, such employee has quit such service; and if any such superintendent or manager shall fail or refuse to issue

such letter to such employee when so requested by such employee, such superintendent or manager shall be deemed guilty of a misdemeanor, and shall be punished by a fine in any sum not exceeding five hundred dollars, or by imprisonment in the county jail for a period not exceeding one year, or by both such fine and imprisonment."

I find nothing in § 290.140 which, expressly or by implication, creates a cause of action for damages. The statute neither imposes a duty on the corporation nor gives a right of action against it but imposes a duty upon the superintendent or manager and upon his (or her) failure to issue the requested letter makes him (or her) guilty of a misdemeanor.

On commentator has, accurately I think, remarked about the statute:

"The statute itself does not specifically create a cause of action whereby the aggrieved employee may recover money damages from his former employer for failure to provide a proper service letter. However, in an early case our Supreme Court *judicially legislated* a cause of action for money damages in favor of the employee. *Cheek v. Prudential Insurance Company of America*, 192 S.W. 387 [(Mo.)]. In later cases it was held that the cause of action for money damages lies solely against the corporate employer and not against the superintendent, manager or other employee to whom the request for a service letter was directed. *Brinks, Inc. v. Hoyt*, 179 F.2d 355 (8th Cir. 1950). Thus, in effect, the statute was *judicially rewritten* to impose liability for money damages on the corporation which presumably is in a position to pay. On the other hand, the penal provision directed to the superintendent or manager by the statute *as written* has fallen into disuse and now seems rather meaningless.

\* \* \* \* \* \*

"Historically, the Service Letter Statute was enacted as remedial legislation to correct the abuse of 'blacklisting,' a practice engaged in by some employers around the turn of the century.

"[O]ne may well ask whether or not the statute still serves a legitimate purpose. Assuming that its purpose is still valid, has the statute been subject to abuse? It seems to the author that the statute is being used to an increasing extent to harass and intimidate employers and to lay the groundwork for litigation irrespective of the contents of the letter. *Bearing in mind that the creation of a cause of action for money damages was an act of judicial legislation by the Missouri Supreme Court,* perhaps the time has come for a reexamination of the statute and its liberal construction by our appellate courts. In an age when the employee has gained a full measure of protection under the law, the Service Letter Statute seems to have lost its original function as a shield for the employee against employer 'blacklisting' and has become instead a wellspring of frivolous litigation in which a jury is invited to second-guess the employer in respect to one of the prerogatives of management, i.e., the termination of the plaintiff's employment." (Emphasis added.)

Soebbing, *The Missouri Service Letter Statute Revisited*, 34 J.Mo.Bar 80, 83 (1978).

I would overrule *Cheek* and its progeny.